### JOHNSON v. SOUTHERN PACIFIC COMPANY.
### SAME v. SAME.

ERROR AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS
FOR THE EIGHTH CIRCUIT.

Nos. 32, 87. Argued October 31, 1904.—Decided December 19, 1904.

1. Statutes in derogation of the common law and penal statutes are not to be construed so strictly as to defeat the obvious intention of Congress as found in the language actually used according to its true and obvious meaning.
2. Locomotive engines are included by the words "any car" contained in the second section of the act of March 2, 1893, 27 Stat. 531, c. 196, requiring cars engaged in interstate commerce to be equipped with automatic couplers. And although they were also required by the first section of the act to be equipped with power driving wheel brakes, the rule that the expression of one thing excludes others does not apply, inasmuch as there was a special reason for that requirement and in addition the same necessity for automatic couplers existed as to them as in respect to other cars.
3. A dining car regularly engaged in interstate traffic does not cease to be so when waiting for the train to make the next trip.
4. The equipment of cars with automatic couplers which will not automatically couple with each other so as to render it unnecessary for men to go between the cars to couple and uncouple is not a compliance with the law.
5. The act of March 2, 1903, 32 Stat. 943, c. 976, treats as correct the view herein expressed and is declaratory thereof.

JOHNSON brought this action in the District Court of the First Judicial District of Utah against the Southern Pacific Company to recover damages for injuries received while employed by that company as a brakeman. The case was removed to the Circuit Court of the United States for the District of Utah by defendant on the ground of diversity of citizenship.

The facts were briefly these: August 5, 1900, Johnson was acting as head brakeman on a freight train of the Southern Pacific Company, which was making its regular trip between San Francisco, California, and Ogden, Utah. On reaching the town of Promontory, Utah, Johnson was directed to uncouple the engine from the train and couple it to a dining car, belonging to the company, which was standing on a side track, for the purpose of turning the car around preparatory to its being picked up and put on the next west-bound passenger train. The engine and the dining car were equipped, respectively, with the Janney coupler and the Miller hook, so called, which would not couple together automatically by impact, and it was, therefore, necessary for Johnson, and he was ordered, to go between the engine and the dining car, to accomplish the coupling. In so doing Johnson's hand was caught between the engine bumper and the dining car bumper and crushed, which necessitated amputation of the hand above the wrist.

On the trial of the case, defendant, after plaintiff had rested, moved the court to instruct the jury to find in its favor, which motion was granted, and the jury found a verdict accordingly, on which judgment was entered. Plaintiff carried the case to the Circuit Court of Appeals for the Eighth Circuit and the judgment was affirmed. 117 Fed. Rep. 462.

*Mr. W. L. Maginnis*, with whom *Mr. L. A. Shaver* and *Mr. John M. Gitterman* were on the brief, for petitioner and plaintiff in error:

The act of Congress of March 2, 1893, in as far as it aims to protect the lives and limbs of men, is remedial in its character,

and should be so construed as to prevent the mischief and advance the remedy. *C., M. & St. P. R. R.* v. *Voelker,* 129 Fed. Rep. 522; *Wall* v. *Platt,* 48 N. E. Rep. 270; *Holy Trinity* v. *United States,* 143 U. S. 457; Potter's Dwarris on Statutes, 234; *Brady* v. *Daly,* 175 U. S. 156; *Reed* v. *Northfield,* 13 Pick. 94; *Huntington* v. *Attrill,* 146 U. S. 665; *United States* v. *Lacher,* 5 Wheat. 76; *Am. Fur Co.* v. *United States,* 2 Pet. 358; *United States* v. *Morris,* 14 Pet. 464; *United States* v. *Reese,* 92 U. S. 214; *United States* v. *Hartwell,* 6 Wall. 385; *United States* v. *Winn,* 3 Sumn. 209; *United States* v. *Mattock,* 2 Sawy. 148.

So construing the law, the word "car" must be held to be used in section 2 of said act in a generic sense and as embracing a locomotive or a tender as well as the other cars composing a train. This view is, moreover, sustained by definitions in the standard dictionaries and also by decisions of the courts. *Fleming* v. *Southern R. R.,* 131 N. Car. 476; *East St. Louis R. R.* v. *O'Hara,* 150 Illinois, 580; *K. C., M. & B. R. R.* v. *Crocker,* 9 Alabama, 412; *Thomas* v. *Ga. R. R.,* 38 Georgia, 222; *New York* v. *Third Avenue R. R.,* 117 N. Y. 444, 646; *Benson* v. *Railroad Co.,* 75 Minnesota, 163.

Locomotives and tenders fall within the reason of the law, as injury to or loss of life or limb of employés is as likely to occur in coupling or uncoupling a locomotive or tender as in case of cars of other descriptions. *Winkler* v. *P. & R. R. R.,* 53 Atl. Rep. 90; *S. C.,* 4 Pennywell, 384.

Even though the locomotive or tender is not to be construed as a car, under sec. 2, the dining car was not equipped so as to couple automatically by impact with the vehicle it was intended to be coupled with, and was therefore not equipped as required by the act of Congress. *B. & O. R. R.* v. *Baugh,* 149 U. S. 378; *Mobile* v. *Kimball,* 102 U. S. 691.

The history of the act of Congress shows that its purpose was not to require cars to be maintained in a condition of equipment with automatic couplers, but rather to govern the equipments only at such times as it was necessary to couple them together. 5th Annual R. Inter. Com. Comm., 1891,

apx. G; 6th Annual R., 1892, 69; 7th Annual R., 1893, 76; 10th Annual R., 1896, 94; 16th Annual R., 1902, 61; The President's Annual Messages, 1889, 1890, 1891, 1892.

Automatic couplers were already in use when this act of Congress was passed, and the evils that were to be remedied were such as grew out of the want of interchangeability between different kinds of automatic couplers so that it is a solecism to say that the statute requires the use of automatic couplers.

Nor can such interpretation of the statute be justified by its practical operation because the railroads of the country, recognizing the necessity of regulations requiring coupling appliances to be interchangeable, had adopted such regulations as a condition of receiving cars. See address of Mr. Haines, Pres. Am. Ry. Assn., at Hotel Brunswick, N. Y., 1892, published in "American Railway Management."

A common carrier cannot be compelled to receive from, and transport for, a connecting line a car defective in safety appliances. *Oregon Short Line &c.* v. *N. P. Ry. Co.*, 51 Fed. Rep. 465; *Mich. Cong. Water Co.* v. *Railway Co.*, 2 I. C. C. Rep. 594; *Railway Co.* v. *Curtis*, 71 N. W. Rep. 42; *Railroad Co.* v. *Snyder*, 45 N. E. Rep. 559; *Wilson* v. *Railroad Co.*, 129 Fed. Rep. 774 (citing *Railroad Co.* v. *Wallace*, 66 Fed. Rep. 506); *Railroad Co.* v. *Mackey*, 157 U. S. 72, 91; *Felton* v. *Bullard*, 94 Fed. Rep. 781.

Congress did not create a "coupler monopoly," because the adoption of a type merely prescribed a condition. See Report of Hearings before House Committee on Interstate and Foreign Commerce in relation to the bill for protection of trainmen, Feb. 18, 1892; Hearing before Senate Committee on Interstate Commerce, Feb. 10, 1892.

Before the enactment of the Safety Appliance Law the railroads had adopted a uniform interchangeable type of coupler. See proceedings of Master Carbuilders' Assn., 1887, 1888 and 1894; Massachusetts R. R. Repts. for 1884, 1886, 1888, 1891.

The intent of the law is that the couplers actually used on

two cars must couple with each other automatically on impact. To hold that the phrase, "couplers coupling automatically by impact," means not couplers coupling with each other but with other couplers not used, is to do violence to the natural meaning of the words and to import into the statute language which will, to a large extent, render it nugatory. A construction of a law contrary to the obvious meaning of its language and which takes from under its operation a case clearly within its reason, should not be indulged.

Automatic couplers were already in use when the act of Congress was passed and the evils to be remedied were those growing out of the want of interchangeability between the different kinds of automatic couplers used rather than the absence of such couplers.

A phrase, "any car used in moving interstate traffic," embraces a car regularly employed in that business until permanently withdrawn. A car being used in interstate traffic between two *termini*, making trips back and forth, is employed in interstate traffic to the same extent while being turned or prepared for a return trip as when actually *en route*. *Voelker* v. *C., M. & St. P. R. R.*, 116 Fed. Rep. 867; *Pullman Car Co.* v. *Pennsylvania*, 141 U. S. 19; *Crawford* v. *N. Y. C. R. R.*, 10 Am. Neg. Rep. 166.

The construction by the court below of this phrase is too narrow and would result in a divided jurisdiction. Under it, while actually moving *en route*, the car would be subject to regulation by Congress, but when it reaches its destination and is being moved preparatory to its return, it will be subject to state regulation. Regulation cannot be in this way "split up." It must be wholly in Congress or wholly in the State. *Hanley* v. *Kansas City Southern Ry. Co.*, 187 U. S. 620; *Lord* v. *S. S. Co.*, 102 U. S. 541; *Pacific Coast S. S. Co.* v. *R. R. Commissioners*, 9 Sawyer, 253.

There is a distinction between a car or instrument used in moving interstate commerce and the commerce itself. A car used in interstate traffic is one thing and the point of time

when the character of interstate commerce attaches to a commodity is another. *Coe* v. *Errol*, 116 U. S. 525, and others cited by defendants, distinguished.

The dining car was generally used in moving interstate commerce and such general use renders it subject to the Safety Appliance Act, although empty at the time of the accident. *Voelker* v. *Railway Co.*, 116 Fed. Rep. 867, 873; *Crawford* v. *Railroad Co.*, 10 Am. Neg. Rep. 166; *The R. W. Parsons*, 191 U. S. 17; *The Old Natchez*, 9 Fed. Rep. 476; *The Daniel Ball*, 10 Wall. 557; *Delaware & Hudson Canal Co.* v. *Pennsylvania*, 1 L. R. A. 232.

There is no distinction between a loaded car and an empty car, as Congress was dealing with a vehicle. *Gibbons* v. *Ogden*, 9 Wheat. 1; *In re Lennon*, 54 Fed. Rep. 746; *Malott* v. *Hood*, 99 Ill. App. 360; *Winkler* v. *P. & R. R. R.*, 53 Atl. Rep. 90.

None of the three things laid down in *Kelley* v. *Rhoads*, 188 U. S. 1, which would take a car out of interstate traffic, to wit: an indefinite delay, (2) awaiting transportation at the commencement of the journey, (3) or waiting sale or delivery at the termination, existed in this case.

The use of the Miller hook with the Janney coupler, because it greatly increased the danger, was negligence, and should be left to the jury. *Greenlee* v. *Ry. Co.*, 122 N. Car. 977, 982; *Troxler* v. *Ry. Co.*, 124 N. Car. 191; *Mather* v. *Rillston*, 156 U. S. 391; *Railway Co.* v. *Carlin*, 111 Fed. Rep. 778; Dissenting opinion in *Kilpatrick* v. *Railroad Co.*, 121 Fed. Rep. 16.

The question of contributory negligence was not considered either in the Circuit Court or the Circuit Court of Appeals; section 8 of the Safety Appliance Law expressly states that any employé injured by reason of defective equipment shall not be deemed to have assumed the risk. If there is any question of contributory negligence it should be left to the jury under proper instructions by the court. *Greenlee* v. *Ry. Co.*, 122 N. Car. 977; *Railroad Co.* v. *Ives*, 144 U. S. 409; *Carson* v. *Railroad*, 46 S. E. Rep. 525.

The amendatory act of March 2, 1903, expressly providing,

amongst other things, that the car coupler provision of section 2 of the original act shall apply to locomotives and tenders as well as ordinary cars, is merely declaratory of the intent of Congress in the original act and is a legislative construction of that act.

The *Attorney General* and the *Solicitor General* for the United States:

The testimony shows that the engine "backed-up" and the tender was therefore presented for the coupling. This is in accordance with common usage and ordinary observation in practical railroading. A tender is certainly a car; but either a locomotive or a tender is a car within the meaning of section 2 of the act of March 2, 1893. The generic meaning of "car" under the definitions and authorities includes engine and tender. *Winkler* v. *P. & R. Ry. Co.*, 53 Atl. Rep. 90; *East St. Louis Ry. Co.* v. *O'Hara*, 150 Illinois, 580; *K. C., M. & B. R. R. Co.* v. *Crocker*, 9 Alabama, 412; *Thomas* v. *Georgia R. R. &c. Co.*, 38 Georgia, 222; *New York* v. *Third Ave. Ry. Co.*, 117 N. Y. 404. The fact that the first section of the act requires a locomotive engine to be equipped with a power brake, and section 2 forbids the use of any car not equipped for coupling as directed, ought not to exclude the full import of the term car in the second section, when the general intent of Congress and the necessary and invariable use of an engine or tender to make couplings are regarded. Nor should the fact that part of the language of section 2 is restricted to the conception of something drawn by the traction power exclude the engine. The language is, "it shall be unlawful for any such common carrier to haul or permit to be hauled *or used* on its lines," etc. Considering the evil and the remedy, the words "or used" ought to be viewed as intentionally enlarging the category so as to include an engine, which is of course more frequently used than any other vehicle of a train in moving traffic. *Use* is the word applied to an engine in the first section.

It is significant that notwithstanding the opposing argument as to engines, this engine was properly equipped; the dining car was in reality the offending thing. No engine of the company at this time, either passenger or freight, was furnished with a Miller hook. This in itself sharply accentuates the necessity for construing the law to include engines, and the plain duty of supplying interchangeable appliances between engines and ordinary cars.

The act of March 2, 1903, which extended the provisions of the act of 1893 relating to automatic couplers, etc., to apply to trains, locomotives, and tenders, did not change or enlarge the earlier law, but should be viewed as a legislative construction and merely declaratory thereof. *United States v. Freeman*, 3 How. 556; *Stockdale v. Insurance Co.*, 20 Wall. 323; *Koshkonong v. Burton*, 104 U. S. 668; *Cope v. Cope*, 137 U. S. 682; *Bailey v. Clark*, 21 Wall. 284.

The provision that the act of 1903 should not take effect until six months after its passage does not weaken this argument, because the suspension evidently related to the new features introduced into the law as to the minimum number of cars in a train to be operated by train brakes. The suspension did not affect a case arising under the original law and involving the meaning of the word "car" or the scope of the automatic coupling requirement, because it was specifically provided by the later act that nothing therein contained should be construed to relieve any common carrier from the liabilities or requirements of the act of 1893. At the very least some *cars* must have been equipped as directed by the act of 1893, and the act of 1903 was not intended to operate as a further extension of time as to them. Did the act of 1903 mean that until September 1 of that year it was not necessary to equip passenger and freight cars with couplers "coupling automatically by impact, etc.?"

The requirement of the law was not complied with by the equipment with couplers which would couple automatically by impact with others of their own type, but which were not

interchangeable with those actually presented. The test of compliance is in the words "without the necessity of men going between the ends of the cars." The loss of life and injuries to railroad employés due to the old link and pin couplings, and especially to the combination of these with patent couplings not working together, and the dilemma as to interchanges of automatic couplers of different types, were clearly in the mind of Congress at the time of the passage of the act of 1893, as appears from an examination of the messages of the President for the years 1889–1892 and from the reports of Senate and House committees and the debates upon the bill. These are proper to refer to in order to show the situation as it existed and was pressed upon the attention of Congress. *American Net: & Twine Co.* v. *Worthington*, 141 U. S. 468; *Holy Trinity Church* v. *United States*, 143 U. S. 457; *Dunlap* v. *United States*, 173 U. S. 65; *Downes* v. *Bidwell*, 182 U. S. 244. The result was that Congress passed an act in which ample provision was made to cover the difficulty and to compel the railroads, whatever particular devices they respectively adopted, to act with such degree of uniformity that the danger should be eliminated by the principle of interchangeability.

The act is remedial and should be liberally construed. *Taylor* v. *United States*, 3 How. 197; *Clicquot* v. *United States*, 3 Wall. 114; *United States* v. *Hodson*, 10 Wall. 395; *Smythe* v. *Fiske*, 23 Wall. 374; *United States* v. *Stowell*, 133 U. S. 12. Even if it should be conceded that the act is penal in a strict sense, yet it should not be construed so strictly as to defeat the intention of Congress; the construction should be fair and reasonable, so as to effectuate the law rather than destroy it, and to avoid absurd and unjust results. *United States* v. *Lacher*, 134 U. S. 624; *United States* v. *Wiltberger*, 5 Wheat. 76; and cases cited on brief of plaintiff in error. But the act is not strictly penal; it is hardly penal at all; it simply imposes a moderate fine, which is to be recovered in a "suit"—that is, a civil action. *Atcheson* v. *Everitt*, 1 Cowp. 382; *Ketland* v. *The Cassius*, 2

Dall. 365; *United States* v. *La Vengeance,* 3 Dall. 297; *The Sarah,* 8 Wheat. 394.

The clause "without the necessity of men going between the ends of the cars" applies to the act of coupling as well as uncoupling. *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Voelker,* 129 Fed. Rep. 522; *Carson* v. *Southern Ry. Co.,* 46 S. E. Rep. 525.

The car was "used in moving interstate traffic," regularly and continuously, as the evidence shows. That phrase of the act does not refer merely to a single trip, nor contemplate that a car shall be actually moving on an interstate journey at the particular moment, but that it shall be ordinarily or customarily employed in that manner, as was the car in question. There is nothing to show that the car was empty; on the contrary, the necessary presumptions are the other way. The statute applies to all cars, whether empty or loaded, and whether temporarily delayed or actually en route, which are "used" in interstate commerce. *Malott* v. *Hood,* 99 Ill. App. 630; *Kelley* v. *Rhoads,* 188 U. S. 1, and cases cited by plaintiff in error.

*Mr. Maxwell Evarts,* with whom *Mr. Martin L. Clardy* and *Mr. Henry G. Herbel,* were on the brief, for respondent and defendant in error:

The dining car was not an interstate car, while it had been in such use and might be thus used again. When it was not so used it maintained its local character and did not come under the act. The mere intention to make a commodity a subject of interstate commerce does not of itself impress the article with that character. *Norfolk &c. Ry.* v. *Commonwealth,* 93 Virginia, 749, 752; *Coe* v. *Errol,* 116 U. S. 517; *Turpin* v. *Burgess,* 117 U. S. 504, 507; *Morgan Co.* v. *Louisiana,* 118 U. S. 455, 465; *Smith* v. *Alabama,* 124 U. S. 465, 482; *Kidd* v. *Pearson,* 128 U. S. 1, 20; *Pullman Co.* v. *Pennsylvania,* 141 U. S. 18, 25; *Postal Tel. Co.* v. *Adams,* 155 U. S. 688, 698; *Adams Express Co.* v. *Ohio,* 165 U. S. 194; *American Ref.*

*Trans. Co.* v. *Hall,* 174 U. S. 70; *Diamond Glue Co.* v. *U. S. Glue Co.,* 187 U. S. 611, 616; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82; *United States* v. *Boyer,* 85 Fed. Rep. 432; *Cotting* v. *Stock Yards Co.,* 82 Fed. Rep. 839, 844; *S. C.,* 183 U. S. 79; *Chi., St. P. &c. Ry.* v. *Becker,* 35 Fed. Rep. 883; *Union Ref. & Trans. Co.* v. *Lynch,* 18 Utah, 378; *Winkley* v. *Newton,* 67 N. H. 80.

When the commodity has actually started the interstate commerce feature commences. *The Daniel Ball,* 10 Wall. 557, 565.

There is a distinction between the commodity and the vehicle. The character of the vehicle must be determined by the destination of the commodity with which it is burdened; or, if empty, the purpose for which the train, of which it forms a part, is being moved at the time of the alleged injury. In other words, it must either be loaded with interstate freight or actually be a part of a train which is moving on an interstate mission. The mere intention to use an isolated car standing in a railroad yard for that purpose is insufficient to give it an interstate character. There is nothing in the car itself to indicate its character; but, chameleon like, it changes its hue according to the use to which it is put at any particular time. *Railway Gross Receipts Case,* 15 Wall. 284, 294; *Wiggins Ferry Co.* v. *East St. Louis,* 107 U. S. 365, 374. See analogous ruling in *Munn* v. *Illinois,* 94 U. S. 113, 135, as to warehouses.

The statute must be strictly construed. The rule of liberal construction of remedial statutes does not apply. Where a statute *creates* a liability, where none existed before, it must be strictly and literally construed. Sutherland on Stat. Construction, § 371.

There was no duty on the railroad company to equip its engines with automatic couplers under the common law.

When language is clear it needs no construction. *Yerke* v. *United States,* 173 U. S. 439; *Thornley* v. *United States,* 113 U. S. 310, and words are to be construed according to their popular sense. *Millard* v. *Lawrence,* 16 How. 251, 261. See

also *Bryce* v. *Burlington &c. Ry. Co.*, 119 Iowa, 274; *Lake County* v. *Rollins*, 130 U. S. 662, and cases cited on p. 670; *United States* v. *Reese*, 92 U. S. 214, 220.

The engine is not within the statute. A penal statute cannot be construed by equity to extend to cases not within the correct and ordinary meaning of the expressions of the law. *United States* v. *Harris*, 177 U. S. 309; *Sarlls* v. *United States*, 152 U. S. 575; *United States* v. *Sheldon*, 2 Wheat. 119, 122.

The policy of the Government does not necessarily call for a liberal construction of the act. *Hadden* v. *Collector*, 5 Wall. 107, 111; *St. Paul &c. Ry.* v. *Phelps*, 137 U. S. 528, 536.

The amendatory act of 1903, 32 Stat. 943, shows that the act originally did not include engines. Neither the engine nor dining car were at the time instruments of interstate commerce. *The Daniel Ball*, 10 Wall. 557; *Chi., St. P. &c. Ry.* v. *Becker*, 35 Fed. Rep. 883.

The interstate commerce act does not apply. It is a penal statute and fails to reach this case. *United States* v. *Harris*, 177 U. S. 305, 309; *Sarlls* v. *United States*, 152 U. S. 570.

Plaintiff assumed the risk. *Railway* v. *Smithson*, 45 Michigan, 212, 220; *Hodges* v. *Kimball*, 44 C. C. A. 193; *Whitcomb* v. *Oil Co.*, 153 Indiana, 513, 519; *Boland* v. *Railway*, 106 Alabama, 641; *Kohn* v. *McNulta*, 147 U. S. 238.

Plaintiff's contributory negligence was such as to bar this action. *San Antonio Traction Co.* v. *De Rodriquez*, 77 S. W. Rep. 420; *Houston &c. Ry.* v. *Martin*, 21 Tex. Civ. App. 207; *Denver & R. G. Ry. Co.*, v. *Arrighi*, 129 Fed. Rep. 347; *Norfolk &c. Ry.* v. *Emmert*, 83 Virginia, 640, 645; *Brooks* v. *Railway Co.*, 47 Fed. Rep. 687; *So. Ry. Co.* v. *Arnold*, 114 Alabama, 183, 189; *Cleary* v *Railway Co.*, 66 N. Y. Supp. 568.

As plaintiff admitted he had been furnished with written rules by the company and had read and was familiar with them, his breach thereof precluded him from recovering for his injuries. *Fluhrer* v. *Railway*, 121 Michigan, 212; *Platton* v. *So. Ry.*, 49 C. C. A. 571; *Erie Ry.* v. *Kane*, 55 C. C. A. 129; *K. &c. Ry.* v. *Dye*, 16 C. C. A. 604.

Mr. Chief Justice Fuller, after making the foregoing statement, delivered the opinion of the court.

This case was brought here on certiorari, and also on writ of error, and will be determined on the merits, without discussing the question of jurisdiction as between the one writ and the other. *Pullman's Car Company* v. *Transportation Company*, 171 U. S. 138, 145.

The plaintiff claimed that he was relieved of assumption of risk under common law rules by the act of Congress of March 2, 1893, 27 Stat. 531, c. 196, entitled "An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes."

The issues involved questions deemed of such general importance that the Government was permitted to file brief and be heard at the bar.

The act of 1893 provided:

"That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system." . . . .

. "Sec. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Sec. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the

provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation, to be recovered in a suit or suits to be brought by the United States district attorney in the District Court of the United States having jurisdiction in the locality where such violation shall have been committed, and it shall be the duty of such district attorney to bring such suits upon duly verified information being lodged with him of such violation having occurred." . . .

"SEC. 8. That any employé of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

The Circuit Court of Appeals held, in substance, Sanborn, J., delivering the opinion and Lochren, J., concurring, that the locomotive and car were both equipped as required by the act, as the one had a power driving-wheel brake and the other a coupler; that section 2 did not apply to locomotives; that at the time of the accident the dining car was not "used in moving interstate traffic;" and, moreover, that the locomotive, as well as the dining car, was furnished with an automatic coupler so that each was equipped as the statute required if section 2 applied to both. Thayer, J., concurred in the judgment on the latter ground, but was of opinion that locomotives were included by the words "any car" in the second section, and that the dining car was being "used in moving interstate traffic."

We are unable to accept these conclusions, notwithstanding the able opinion of the majority, as they appear to us to be inconsistent with the plain intention of Congress, to defeat the object of the legislation, and to be arrived at by an inadmissible narrowness of construction.

The intention of Congress, declared in the preamble and in

sections one and two of the act, was "to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes," those brakes to be accompanied with "appliances for operating the train-brake system;" and every car to be "equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars," whereby the danger and risk consequent on the existing system was averted as far as possible.

The present case is that of an injured employé, and involves the application of the act in respect of automatic couplers, the preliminary question being whether locomotives are required to be equipped with such couplers. And it is not to be successfully denied that they are so required if the words "any car" of the second section were intended to embrace, and do embrace, locomotives. But it is said that this cannot be so because locomotives were elsewhere in terms required to be equipped with power driving-wheel brakes, and that the rule that the expression of one thing excludes another applies. That, however, is a question of intention, and as there was special reason for requiring locomotives to be equipped with power driving-wheel brakes, if it were also necessary that locomotives should be equipped with automatic couplers, and the word "car" would cover locomotives, then the intention to limit the equipment of locomotives to power driving-wheel brakes, because they were separately mentioned, could not be imputed. Now it was as necessary for the safety of employés in coupling and uncoupling, that locomotives should be equipped with automatic couplers, as it was that freight and passenger and dining cars should be, perhaps more so, as Judge Thayer suggests, "since engines have occasion to make couplings more frequently."

And manifestly the word "car" was used in its generic sense. There is nothing to indicate that any particular kind

of car was meant. Tested by context, subject matter and object, "any car" meant all kinds of cars running on the rails, including locomotives. And this view is supported by the dictionary definitions and by many judicial decisions, some of them having been rendered in construction of this act. *Winkler* v. *Philadelphia & Reading Railway Company*, 53 Atl. Rep. 90; 4 Penn. (Del.) 387; *Fleming* v. *Southern Railway Company*, 131 N. Car. 476; *East St. Louis Connecting Railway Company* v. *O'Hara*, 150 Illinois, 580; *Kansas City &c. Railroad Company* v. *Crocker*, 95 Alabama, 412; *Thomas* v. *Georgia Railroad and Banking Company*, 38 Georgia, 222; *Mayor &c.* v. *Third Ave. R. R. Co.*, 117 N. Y. 404; *Benson* v. *Railway Company*, 75 Minnesota, 163.

The result is that if the locomotive in question was not equipped with automatic couplers, the company failed to comply with the provisions of the act. It appears, however, that this locomotive was in fact equipped with automatic couplers, as well as the dining car, but that the couplers on each, which were of different types, would not couple with each other automatically by impact so as to render it unnecessary for men to go between the cars to couple and uncouple.

Nevertheless, the Circuit Court of Appeals was of opinion that it would be an unwarrantable extension of the terms of the law to hold that where the couplers would couple automatically with couplers of their own kind, the couplers must so couple with couplers of different kinds. But we think that what the act plainly forbade was the use of cars which could not be coupled together automatically by impact, by means of the couplers actually used on the cars to be coupled. The object was to protect the lives and limbs of railroad employés by rendering it unnecessary for a man operating the couplers to go between the ends of the cars, and that object would be defeated, not necessarily by the use of automatic couplers of different kinds, but if those different kinds would not automatically couple with each other. The point was that the

railroad companies should be compelled, respectively, to adopt devices, whatever they were, which would act so far uniformly as to eliminate the danger consequent on men going between the cars.

If the language used were open to construction, we are constrained to say that the construction put upon the act by the Circuit Court of Appeals was altogether too narrow.

This strictness was thought to be required because the common law rule as to the assumption of risk was changed by the act, and because the act was penal.

The dogma as to the strict construction of statutes in derogation of the common law only amounts to the recognition of a presumption against an intention to change existing law, and as there is no doubt of that intention here, the extent of the application of the change demands at least no more rigorous construction than would be applied to penal laws. And, as Chief Justice Parker remarked, conceding that statutes in derogation of the common law are to be construed strictly, "they are also to be construed sensibly, and with a view to the object aimed at by the legislature." *Gibson* v. *Jenney*, 15 Massachusetts, 205.

The primary object of the act was to promote the public welfare by securing the safety of employés and travelers, and it was in that aspect remedial, while for violations a penalty of one hundred dollars, recoverable in a civil action, was provided for, and in that aspect it was penal. But the design to give relief was more dominant than to inflict punishment and the act might well be held to fall within the rule applicable to statutes to prevent fraud upon the revenue, and for the collection of customs, that rule not requiring absolute strictness of construction. *Taylor* v. *United States*, 3 How. 197; *United States* v. *Stowell*, 133 U. S. 1, 12, and cases cited. And see *Farmers' and Merchants' National Bank* v. *Dearing*, 91 U. S. 29, 35; *Gray* v. *Bennett*, 3 Met. (Mass.) 522.

Moreover, it is settled that "though penal laws are to be construed strictly, yet the intention of the legislature must

govern in the construction of penal as well as other statutes; and they are not to be construed so strictly as to defeat the obvious intention of the legislature." *United States* v. *Lacher*, 134 U. S. 624. In that case we cited and quoted from *United States* v. *Winn*, 3 Sumn. 209, in which Mr. Justice Story, referring to the rule that penal statutes are to be construed strictly, said:

"I agree to that rule in its true and sober sense; and that is, that penal statutes are not to be enlarged by implication, or extended to cases not obviously within their words and purport. But where the words are general, and include various classes of persons, I know of no authority, which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, where the mischief to be redressed by the statute is equally applicable to all of them. And where a word is used in a statute, which has various known significations, I know of no rule, that requires the court to adopt one in preference to another, simply because it is more restrained, if the objects of the statute equally apply to the largest and broadest sense of the word. In short, it appears to me, that the proper course in all these cases, is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner, the apparent policy and objects of the legislature."

Tested by these principles, we think the view of the Circuit Court of Appeals, which limits the second section to merely providing automatic couplers, does not give due effect to the words "coupling automatically by impact, and which can be uncoupled without the necessity of men going between the cars," and cannot be sustained.

We dismiss as without merit the suggestion, which has been made, that the words "without the necessity of men going between the ends of the cars," which are the test of compliance with section two, apply only to the act of uncoupling. The phrase literally covers both coupling and uncoupling, and if

read, as it should be, with a comma after the word "uncoupled," this becomes entirely clear. *Chicago, Milwaukee & St. Paul Railway Company* v. *Voelker,* 129 Fed. Rep. 522; *United States* v. *Lacher, supra.*

The risk in coupling and uncoupling was the evil sought to be remedied, and that risk was to be obviated by the use of couplers actually coupling automatically. True, no particular design was required, but whatever the devices used they were to be effectively interchangeable. Congress was not paltering in a double sense. And its intention is found "in the language actually used, interpreted according to its fair and obvious meaning." *United States* v. *Harris,* 177 U. S. 305, 309.

That this was the scope of the statute is confirmed by the circumstances surrounding its enactment, as exhibited in public documents to which we are at liberty to refer. *Binns* v. *United States,* 194 U. S. 486, 495; *Holy Trinity Church* v. *United States,* 143 U. S. 457, 463.

President Harrison, in his annual messages of 1889, 1890, 1891 and 1892, earnestly urged upon Congress the necessity of legislation to obviate and reduce the loss of life and the injuries due to the prevailing method of coupling and braking. In his first message he said: "It is competent, I think, for Congress to require uniformity in the construction of cars used in interstate commerce, and the use of improved safety appliances upon such trains. Time will be necessary to make the needed changes, but an earnest and intelligent beginning should be made at once. It is a reproach to our civilization that any class of American workmen should, in the pursuit of a necessary and useful vocation, be subjected to a peril of life and limb as great as that of a soldier in time of war."

And he reiterated his recommendation in succeeding messages, saying in that for 1892: "Statistics furnished by the Interstate Commerce Commission show that during the year ending June 30, 1891, there were forty-seven different styles of car couplers reported to be in use, and that during the same period there were 2,660 employés killed and 26,140 injured.

Nearly 16 per cent of the deaths occurred in the coupling and uncoupling of cars, and over 36 per cent of the injuries had the same origin."

The Senate report of the first session of the Fifty-second Congress (No. 1049), and the House report of the same session (No. 1678), set out the numerous and increasing casualties due to coupling, the demand for protection, and the necessity of automatic couplers, coupling interchangeably. The difficulties in the case were fully expounded and the result reached to require an automatic coupling by impact so as to render it unnecessary for men to go between the cars, while no particular device or type was adopted, the railroad companies being left free to work out the details for themselves, ample time being given for that purpose. The law gave five years, and that was enlarged, by the Interstate Commerce Commission as authorized by law, two years, and subsequently seven months, making seven years and seven months in all.

The diligence of counsel has called our attention to changes made in the bill in the course of its passage, and to the debates in the Senate on the report of its committee. 24 Cong. Rec., pt. 2, pp. 1246, 1273 et seq. These demonstrate that the difficulty as to interchangeability was fully in the mind of Congress and was assumed to be met by the language which was used. The essential degree of uniformity was secured by providing that the couplings must couple automatically by impact without the necessity of men going between the ends of the cars.

In the present case the couplings would not work together, Johnson was obliged to go between the cars, and the law was not complied with.

March 2, 1903, 32 Stat. 943, c. 976, an act in amendment of the act of 1893 was approved, which provided, among other things, that the provisions and requirements of the former act "shall be held to apply to common carriers by railroads in the Territories and the District of Columbia and shall apply in all cases, whether or not the couplers brought together are of the

same kind, make, or type;" and "shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce."

This act was to take effect September first, nineteen hundred and three, and nothing in it was to be held or construed to relieve any common carrier "from any of the provisions, powers, duties, liabilities, or requirements" of the act of 1893, all of which should apply except as specifically amended.

As we have no doubt of the meaning of the prior law, the subsequent legislation cannot be regarded as intended to operate to destroy it. Indeed, the latter act is affirmative, and declaratory, and, in effect, only construed and applied the former act. *Bailey* v. *Clark,* 21 Wall. 284; *United States* v. *Freeman,* 3 How. 556; *Cope* v. *Cope,* 137 U. S. 682; *Wetmore* v. *Markoe, post,* p. 68. This legislative recognition of the scope of the prior law fortifies and does not weaken the conclusion at which we have arrived.

Another ground on which the decision of the Circuit Court of Appeals was rested remains to be noticed. That court held by a majority that as the dining car was empty and had not actually entered upon its trip, it was not used in moving interstate traffic, and hence was not within the act. The dining car had been constantly used for several years to furnish meals to passengers between San Francisco and Ogden, and for no other purpose. On the day of the accident the eastbound train was so late that it was found that the car could not reach Ogden in time to return on the next westbound train according to intention, and it was therefore dropped off at Promontory to be picked up by that train as it came along that evening.

The presumption is that it was stocked for the return, and as it was not a new car, or a car just from the repair shop, on its way to its field of labor, it was not "an empty," as that term is sometimes used. Besides, whether cars are empty or loaded, the danger to employés is practically the same, and we agree with the observation of District Judge Shiras in *Voelker* v. *Railway Company,* 116 Fed. Rep. 867, that "it can-

not be true that on the eastern trip the provisions of the act of Congress would be binding upon the company, because the cars were loaded, but would not be binding upon the return trip, because the cars are empty."

Counsel urges that the character of the dining car at the time and place of the injury was local only and could not be changed until the car was actually engaged in interstate movement or being put into a train for such use, and *Coe* v. *Errol*, 116 U. S. 517, is cited as supporting that contention. In *Coe* v. *Errol* it was held that certain logs cut in New Hampshire, and hauled to a river in order that they might be transported to Maine, were subject to taxation in the former State before transportation had begun.

The distinction between merchandise which may become an article of interstate commerce, or may not, and an instrument regularly used in moving interstate commerce, which has stopped temporarily in making its trip between two points in different States, renders this and like cases inapplicable.

Confessedly this dining car was under the control of Congress while in the act of making its interstate journey, and in our judgment it was equally so when waiting for the train to be made up for the next trip. It was being regularly used in the movement of interstate traffic and so within the law.

Finally it is argued that Johnson was guilty of such contributory negligence as to defeat recovery, and that, therefore, the judgment should be affirmed. But the Circuit Court of Appeals did not consider this question, nor apparently did the Circuit Court, and we do not feel constrained to inquire whether it could have been open under § 8, or, if so, whether it should have been left to the jury under proper instructions.

*The judgment of the Circuit Court of Appeals is reversed; the judgment of the Circuit Court is also reversed, and the cause remanded to that court with instructions to set aside the verdict and award a new trial.*