Roy Orlen **HATTAWAY**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 19228.

United States Court of Appeals
Fifth Circuit.

June 6, 1962.

Isaac F. Hawkins, Jr., Shreveport, La., for appellant.

T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., Marshall Tamor Gold-

ing, Atty., Dept. of Justice, Washington, D. C., Herbert J. Miller, Jr., Asst. Atty. Gen., Criminal Division, Dept. of Justice, for appellee.

Before BROWN and WISDOM, Circuit Judges, and DeVANE, District Judge.

JOHN R. BROWN, Circuit Judge.

The question here is whether indictment really means indictment. We hold that it does, and the indictment, having been returned for the first time after the running of the controlling statute of limitations, prosecution of this case of kidnapping was barred and the conviction cannot stand. We accordingly reverse.

The case turns on § 3288 of the Criminal Code which extends the limitations period:

"Whenever an indictment is dismissed for any error, defect or irregularity with respect to the grand jury, or is found otherwise defective or insufficient for any cause, after the period prescribed by the applicable statute of limitations has expired, a new indictment may be returned not later than the end of the next succeeding regular term of such court, following the term at which such indictment was found defective or insufficient, during which a grand jury shall be in session which new indictment shall not be barred by any statute of limitations." 18 U.S.C.A. § 3288.

As is so frequent, the difficult and serious problem arises out of facts which are strikingly simple, neither complex nor conflicting. On December 13, 1953, appellant and a hitchhiking companion, after being picked up in East Texas by the Good Samaritan, forced their host at gun point to surrender control of his car and to accompany them to Louisiana. There the victim was released unharmed when the abductors were apprehended by Louisiana State Police. As a noncapital offense under the kidnapping statute (18 U.S.C.A. § 1201), the statute of limitations was five years,[1] and unless tolled, the case would be barred in December 1958. Within less than a month from the crime, appellant on January 8, 1954, appeared in court, waived indictment and a Bill of Information was filed against him charging violation of the kidnapping statute.[2] Of critical importance—though not then realized—the allegations in the information were in the words of the statute, but silent as to whether the victim was released harmed or unharmed. On his plea of guilty, a 25-year sentence was imposed. Seven years later, March 1961, by a 28 U.S.C.A. § 2255 proceeding, he attacked this conviction. The ground was that under the allegations of the information, he was actually charged with a capital offense which, under F.R. Crim.P. 7(a), 18 U.S.C.A., can be brought only by indictment[3] so his waiver under 7(b) was not permitted.[4]

The Government did not resist this, nor could it. For by now Smith v. United

---

1. "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C.A. § 3282.

2. Also charged was a violation of the Dyer Act, 18 U.S.C.A. § 2312. The sentence for this crime has been served and it is no longer involved.

3. *"Use of Indictment or Information.* An offense which may be punished by death shall be prosecuted by indictment. An offense which may be punished by im-

prisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment or, if indictment is waived, it may be prosecuted by information. Any other offense may be prosecuted by indictment or by information. An information may be filed without leave of court." F.R.Crim.P. 7(a).

4. *"Waiver of Indictment.* An offense which may be punished by imprisonment for a term exceeding one year or at hard labor may be prosecuted by information if the defendant, after he has been advised of the nature of the charge and of his rights, waives in open court prosecution by indictment." F.R.Crim.P. 7(b).

States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041,[5] had been decided on June 8, 1959. There the Court held that even though the information was silent on whether the victim was released harmed or unharmed proof showing that the victim had been harmed would have been permissible. On it, the Court or jury could assess capital punishment.[6] Indictment was therefore the only way to prosecute the crime. The trial Court lacked jurisdiction, and the sentence was a nullity since " * * * the waivers made by petitioner were not binding and did not confer power on the convicting court to hear the case." 360 U.S. at 10, 79 S.Ct. at 997.

Consequently, on March 27, 1961, the judgment of conviction was vacated. But on the same day—8 years after the crime—an indictment was returned charging exactly the same offense. Upon a trial before the Court without a jury, the appellant was adjudged guilty, and a sentence of 7½ years imposed. It is from that sentence that this appeal asserts the basic contention that prosecution was barred by the 5-year statute of limitations, § 3282. See note 1, supra.

Several things are perfectly plain. There has been but one Grand Jury indictment—one returned 8 years after the crime. Since there has been no prior Grand Jury indictment, no such indictment has been " * * * dismissed for any error, defect or irregularity with respect to the grand jury * * *," nor has it been " * * * found otherwise defective or insufficient for any cause * * *." § 3288. The Government does

not attempt to explain this away. It takes the frank, positive position that when Congress said "indictment," it was not using this word in the unique technical sense which it has in a formalized systematic body of criminal law. Rather, the Government urges, Congress was using it in the generic, and much looser sense, to refer to any formal accusation, charge or statement of grievance or wrongdoing. This, then, would encompass any mode recognized by law, whether existing at the time of the enactment of the statute, or coming into being later on, by which one alleged to have committed an offense is formally accused.

This is the central core of the Government's contention. In a thorough-going brief that does credit to its authors and the important seriousness of the issue, it expounds a number of the tangible convenient formulas on statutory construction, none of which are ever really very helpful until a given result is reached after which the given principle matches the given result with perfection.

In that process, it is hardly surprising that the solution is not found in the dictionary. Lexicographers are not, therefore, the Judges. The Government frankly acknowledges that the word has two distinctive meanings, both relating to law, one purely technical as the descriptive meanings of a specific legal mechanism, the other, the generic one, having reference to any mode of accusation. Moreover, the Government believes it must fairly be acknowledged that the authorities are in dispute as to which is the primary meaning.[7]

---

5. This case had quite a career in this Court and demonstrates again the debt of gratitude owed to court-appointed counsel. Smith v. United States, 1955, 5 Cir., 223 F.2d 750, District Court after remand, 137 F.Supp. 222; Smith v. United States, 5 Cir., 1956, 238 F.2d 925; Smith v. United States, 5 Cir., 1957, 240 F.2d 347.

6. "Whoever knowingly transports in interstate * * * commerce, any person who has been unlawfully seized, * * * kidnaped, abducted, or carried away * * * shall be punished (1) by death

if the kidnapped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." 18 U.S.C.A. § 1201(a).

7. The Government's brief reviews it in these terms.
Thus, Funk & Wagnalls, New Standard Dictionary of the English Language, 1947, p. 1251, characterizes the word as one of "law," and gives two definitions for it. The first definition given is the generic one:

Likewise, it is not surprising that instances can be found in which Judges writing opinions have used this term in its generic sense, probably loosely on some occasions,[8] while in others the sense of the statute or problem under review made such a connotation the obviously correct one.[9]

Great stress is then laid on accepted canons of construction, the foremost being that the "* * * object in construing penal as well as other statutes,

1. The act of indicting, or the state of being indicted; formal charge or accusation in general.

The technical definition is given as the secondary one:

2. A formal written charge of crime, preferred at the suit of the government and presented by a grand jury on oath to the court in which it is impaneled, as the basis for trial of the accused; the legal document itself.

See also p. 1250 on the definition of "indict."

The Century Dictionary and Cyclopedia, 1911, Vol. V. P. 3059 gives the generic definition as the primary one:

1. The act of indicting; accusation; formal charge or statement of grievances; formal complaint before a tribunal.

but characterizes the secondary definition as one of "law":

2. In law, the formal complaint by which a criminal offense, found by a grand jury to have been committed, is by it charged against the supposed offender for presentation to the court, that he may be put on trial.

However, the Century definition of "indict" parallels that of Funk & Wagnalls. See also Fowler, A Dictionary of Modern Usage, 1940, p. 267; MacMillan's Modern Dictionary, 1938, p. 542, as to the term "indict."

On the other side, Webster's New International Dictionary of the English Language, 2d Ed., Unabridged, 1934, p. 1266, gives primacy to the technical definition:

Act of indicting, or state of being indicted; esp., the legal process by which a bill of indictment is preferred to, and presented by, a grand jury. 2. Law. The formal written statement charging one or more persons with an offense, as framed by the prosecuting authority of the state, and found by the grand jury. It is distinctively called a *bill of indictment* until it is found or ignored by the grand jury. It differs from an *information*, which rests only on presentation by the prosecuting authority, and properly from a *presentment*, which is an accusation originating with the grand jury. *The word is sometimes loosely used to include an information or presentment or both, as in some British statutes, and in Australia.* (Emphasis added.)

and does the same in its definition of "indict" on p. 1265:

1. To charge with an offense; esp. *Law*, to charge with a crime by the finding or presentment of a grand jury in due form of law; to find an indictment against * * *

2. To charge with (an offense). *Rare.*

Black's Law Dictionary, 4th Ed., 1951, p. 912 and Bouvier's Law Dictionary and Concise Encyclopedia, 3d Rev., 8th Ed., 1914, Vol. II, p. 1542 both report on the technical definition.

It should be noted that both Black's at p. 918 and Bouvier's at p. 1566 define an "information" as "[a]n accusation *in the nature of an indictment,* from which it differs only in being presented by a competent public officer on his oath of office, instead of a grand jury on their oath."

8. See, e. g., Lem Woon v. Oregon, 1913, 229 U.S. 586, 587, 33 S.Ct. 783, 57 L.Ed. 1340.

9. See, e. g., these federal cases. Grin v. Shine, 1902, 187 U.S. 181, 192, 23 S.Ct. 98, 47 L.Ed. 130 (extradition of foreigner charged by his country with a crime, but not "indicted" as the statute expressly required since this mechanism was unknown to Russian law); Quinones v. United States, 1 Cir., 1947, 161 F.2d 79, cert. denied, 331 U.S. 833, 67 S.Ct. 1513, 91 L.Ed. 1846 (unlawful transportation of firearms by person "under indictment," 15 U.S.C.A. § 902(e) applies to one under a charge of murder under a Puerto Rican information, indictments as such being unknown); American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 117, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, (use of alternate jurors as to defendants charged by information though statute specifies merely defendants "against whom has been filed any indictment." 28 U.S.C.A. § 417a). It cites United States v. Borger, C.C.N.Y., 1881, 7 F. 193, and In re Smith, C.C. Mass., 1882, 13 F. 25 (a defendant standing mute; statute requiring the court to enter a plea of not guilty as to a defendant "indicted" was held applicable to defendants charged by information). There are also a number of state cases cited.

is to ascertain the legislative intent. That constitutes the law." United States v. Hartwell, 1868, 6 Wall. 385, 395–396, 73 U.S. 385, 18 L.Ed. 830. Likewise, the clearly revealed policy should be effectuated even though it may be doubtful whether new developments may be within the terminology actually employed in the statute. This emphasis is epitomized by Mr. Justice Holmes' declaration on circuit that "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed." Johnson v. United States, 1 Cir., 1908, 163 F. 30, 32, which was echoed and expanded in United States v. Hutcheson, 1941, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788. Another factor, perhaps negative in nature, is the necessity of construing a statute to avoid absurdities. "All laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose." United States v. Katz, 1926, 271 U.S. 354, 357, 46 S.Ct. 513, 70 L.Ed. 986. And that rules out literalism as an absolute and an end in and of itself [10] as we have many times held. See Fulford v. Forman, 5 Cir., 1957, 245 F.2d 145, 149; Keith v. United States, 5 Cir., 1957, 250 F.2d 355, 357; Florida Citrus Exchange v. Folsom, 5 Cir., 1957, 246 F.2d 850, 857.

Finally, in terms of familiar canons, it is urged that the rule of strict construction applicable frequently to criminal statutes is not proper here. Rather, the Government insists, such a rule is restricted to those criminal statutes which are penal in the sense of defining standards of conduct and imposing sanctions for violations. See United States v. Wiltberger, 1820, 5 Wheat. 76, 95, 18 U.S. 76, 5 L.Ed. 37; M. Kraus & Bros. v. United States, 1946, 327 U.S. 614, 621–622, 66 S.Ct. 705, 90 L.Ed. 894; Bell v. United States, 1955, 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905. More than that, the rule is not an absolute.[11] "The rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute in disregard of their context and in frustration of the obvious legislative intent. * * * The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular instead of the more narrow technical one; but the words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent." United States v. Corbett, 1909, 215 U.S. 233, 242, 30 S.Ct. 81, 54 L.Ed. 173.

A good way to end—just as it was a good way to begin—this brief discussion of formalized canons is to repeat Mr. Justice Storey's words from United States v. Winn, 3 Sumn. 209, 211, Fed.Cas.No.16,740, and later set forth in Johnson v. Southern Pacific Co., 1904, 196 U.S. 1, 18, 25 S.Ct. 158, 49 L.Ed. 363. "In short, it appears to me, that the proper course in all these cases, is to search out and follow the true intent

10. United States v. American Trucking Ass'n, 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195; Haggar Co. v. Helvering, 1940, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340; Lau Ow Bew v. United States, 1892, 144 U.S. 47, 59, 12 S.Ct. 517, 36 L.Ed. 340.

11. Couching the problem (or the result) in terms of strict or liberal construction frequently offers little help. Here, the statute of limitations—one of repose—should ordinarily be construed liberally. See, e. g., Bridges v. United States, 1953, 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557; United States v. Scharton, 1932, 285 U.S. 518, 521–522, 52 S.Ct. 416, 76 L.Ed. 917; United States v. McElvain, 1926, 272 U.S. 633, 639, 47 S.Ct. 219, 71 L.Ed. 451, which illustrate the semantic incongruity of a statute of limitations being liberally construed by requiring strict construction of exceptions in it. One neutralizes the other.

of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner, the apparent policy and objects of the legislature."

■■ The problem thus begins and ends with the statute under review: what did Congress intend by the term "indictment"? When this statute is examined in the light of the circumstances surrounding its enactment, the brief legislative history, and the intrinsic verbal evidence of purpose contained in it, we are of the clear view that Congress purposely chose this word to connote the traditional, formal, written charge returned by a Grand Jury. The term did not, therefore, include charges brought by complaint [12] or an information.

While the Government insists that this separate statute was a part of an anti-crime package [13] flowing from intense contemporary interest by Congress in the growing menace of organized big-time crime and racketeering,[14] the legislative history, brief as it is, reflects no purpose to treat the word indictment as an all-inclusive loose generic term. As was the case of the 1940 Amendments intended to legislatively overrule the decision of the Supreme Court in United States v. Durkee Famous Foods, Inc., 1939, 306 U.S. 68, 59 S.Ct. 456, 83 L.Ed. 492, the sole legislative history is an identical letter requesting enactment sent by the Attorney General to the appropriate Committee Chairmen.[15] The purpose was clear, of course, to overcome the statute of limitations where an indictment is found defective or insufficient for any cause, but every reference to that situation, both in the letters of the Attorney General and in the resulting statute, tie the purpose to toll the statute of limitations with the term "indictment." [16]

The words of the statute reveal to us unmistakable intrinsic signs of legislative purpose. Thus, the very first situation covered by this remedial enactment ties the term "indictment" directly to

12. See, e. g., 26 U.S.C.A. § 6531, which establishes a nine-month extension of the limitation period by the filing of a complaint before a Commissioner in certain crimes under the Revenue Acts.

13. The Government's brief lists the following felony statutes as presently designated enacted or amended as a result of these studies:
   18 U.S.C. §§ 111 and 1114 (killing and assaulting public officers);
   18 U.S.C. § 874 (Kickbacks);
   18 U.S.C. § 875 (Extortion by use of interstate commerce);
   18 U.S.C. § 1073 (flight to avoid prosecution);
   18 U.S.C. § 1201 (kidnapping);
   18 U.S.C. § 1792 (conspiracy to cause mutiny or riot in federal penal institutions);
   18 U.S.C. § 1951 (racketeering);
   18 U.S.C. § 2113 (bank robbery);
   18 U.S.C. §§ 2312, 2313 (motor vehicle theft);
   15 U.S.C. §§ 901–909 (Federal Firearms Act);
   49 U.S.C. §§ 781–788 (National Firearms Act).
   The following are the present designation of the procedural statutes enacted:
   18 U.S.C. § 3042 (extraterritorial jurisdiction over fugitives from justice);
   18 U.S.C. § 3052 (Powers of FBI to make arrests, etc.);
   18 U.S.C. § 3059 (authorizing rewards);
   4 U.S.C. § 111 (interstate pacts to combat crime).

14. Subcommittee of the Senate Committee on Commerce pursuant to Senate Resolution 74, 73rd Congress, June 12, 1933, and as to crime and criminal practices generally pursuant to Senate Resolution 196, 73rd Congress, February 20, 1934.

15. As to the statute in its 1934 original form, this is set forth in Senate Report No. 405, 73rd Congress, 2d Session, and House Report No. 1459, 73rd Congress, 2d Session, and is quoted at length by the Supreme Court in the Durkee case, 306 U.S. 68 at 71, note 2, 59 S.Ct. 456.
   For the 1940 Amendment overruling the Durkee decision, the letter is set forth in House Report No. 1620, 76th Congress, 3rd Session, and Senate Report No. 1802, 76th Congress, 3rd Session.

16. The decisions in United States v. Strewl, 2 Cir., 1947, 162 F.2d 819, 820, cert. denied, 332 U.S. 801, 68 S.Ct. 92, 92 L.Ed. 381, and 1938, 99 F.2d 474, 477, cert. denied, 306 U.S. 638, 59 S.Ct. 489, 83 L. Ed. 1039, revealing this policy, merely beg the question facing us.

the Grand Jury. The opening phrase is: "Whenever an indictment is dismissed for any error, defect or irregularity *with respect to the grand jury * * *.*" The other situation sou‸ht to be covered by the statute relates to defects in the indictment, as distinguished from deficiencies of the indicting body. Thus the statute refers to situations in which an indictment "is found otherwise defective or insufficient for any cause." But it is significant that this is covered by a second clause, the subject of which is the indictment referred to in the opening phrase. That, of course, referred to "an indictment" found invalid because of an "error, defect or irregularity with respect to the grand jury." Dealing with such an indictment, that is one returned by a Grand Jury, the statute is equally plain in prescribing the procedural reform. In either one or both of such events, the statute provides that "a new indictment may be returned," thus tying two terms having defined technical legal connotations together. But even this does not depend on the necessity of reading the word "returned" as a technical concept. For the statute goes on to prescribe the time in which corrective action may be taken in relation to the term of the court "during which a grand jury shall be in session." [17]

Whatever doubt there might have been on this score—and we think there could have been none—was legislatively eradicated by the circumstances of the 1940 Amendments designed to overcome the Durkee holding. That decision dealt entirely with the Grand Jury aspect of the statute. So did the Amendment in defining time as not later than the next succeeding term at which a Grand Jury was in session.

Of course, all of this made a good deal of sense. Indeed, any other meaning at that time would have made no sense at all. For both in 1934 and in 1940 there was only one way to commence the prosecution of a felony—by indictment of a Grand Jury. To suggest now that the word "indictment" was meant to include any or all modes of commencement of felony prosecutions is to attribute to Congress a purpose to cover not only the sole existing method, but those then unknown or unheard of and, indeed, perhaps beyond the constitutional power of Congress to prescribe. There was, then, no way for an accused to be tried or sentenced except upon a Grand Jury indictment. There was no provision for waiver of indictment and prosecution by an information filed with consent. This did not come until 1946 with the adoption of F.R.Crim.P. 7.[18]

To this the Government makes a curious twist. Because, it asserts, felonies could not then be prosecuted save by indictment, and Congress knew that only that method was available, there was no necessity for it to refer expressly to "an information" or "a complaint" in providing for tolling the statute of limitations. In other words, by referring to the only known, and probably valid compulsory method, Congress meant to include every method which might at some day, in some place, as to some crime be available under some conditions to some defendants.

We can find no basis for imputing to Congress any such elusive purposes. To do so not only takes reason to the brink. It overlooks entirely that Congress was here dealing with matters known to be of constitutional proportions. Its importance is not in terms of the more frequent problem of an awareness by Con-

17. Similar terminology was used in the parallel statute permitting reindictment after the running of the statute of limitations where the indictment was dismissed prior to the expiration of the limitations period. 18 U.S.C.A. § 3289.

18. As to this much needed reform, see the notes to Rules of Criminal Procedure by the Advisory Committee, 4 F.R.D. 405, 410–411, and Holtzoff, Codification of Federal Criminal Procedure, 4 F.R.D. 275, 280; Holtzoff, Reform of Federal Criminal Procedure, 3 F.R.D. 445, 449–450.

gress of possible constitutional limitations as to its power. There is no indication here that in 1934 or 1940 anyone for a moment entertained any notion at all of pressing for statutory reforms beyond, or even to the very limit, of constitutional power. On the contrary, the constitutional aspect is relevant because of congressional awareness that the only compulsory means—then and now—available for prosecution of felonies is the Grand Jury indictment. The Fifth Amendment commanded it in emphatic terms.[19] And Congress was also aware that the Supreme Court, from the very earliest days, had declared that any offense punishable by penitentiary confinement was an infamous crime within the meaning of the Fifth Amendment so that a Court lacked *power* to conduct a trial and convict for such a crime in the absence of an indictment. Ex parte Wilson, 1885, 114 U.S. 417, 422, 429, 5 S.Ct. 935, 29 L.Ed. 89; Mackin v. United States, 1886, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909; Stirone v. United States, 1960, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252; Green v. United States, 1958, 356 U.S. 165, 183, 78 S.Ct. 632, 2 L.Ed.2d 672.

It is unthinking that Congress, in dealing with statutes designed to overcome the bar of limitations through the assertion of technical errors by those accused of crime would have legislated in terms of prosecutions initially commenced by constitutionally incompetent methods. Congress knew felonies required an indictment by the Grand Jury. It meant to cover all situations in which such an indictment was for any reason held to be legally ineffective. But for a

word having such an imperative meaning in the context of the commencement of prosecutions for felonies, it did not intend for that word to cover methods not then legally available.

Indeed, it was just such considerations that led the Court to reach its decision in the very case which brought on this whole problem, Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041. The Court first traced the elimination of technical deficiencies in criminal prosecutions. It then acknowledged that this "has been a salutary development in the criminal law." 360 U.S. 1, 9, 79 S.Ct. 991. "But," the Court went on, "the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules. The use of indictments in all cases warranting serious punishment was the rule at common law. * * * The Fifth Amendment made the rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings. Ex parte Bain, 121 U.S. 1, [7 S.Ct. 781, 30 L.Ed. 849;] * * *." 360 U.S. 1, 9, 79 S.Ct. 991. The Court, refusing to construe F.R. Crim.P. 7 to permit a waiver in a case which might become a capital one, declared that "We cannot do this in view of the traditional canon of construction which calls for the strict interpretation of criminal statutes and rules in favor of defendants where substantial rights are involved." 360 U.S. 1, 9, 79 S.Ct. 991.

No more can we read into "indictment" what is so plainly not there.

Reversed.

19. "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" except in certain cases not here pertinent.