## CHICAGO, M. & P. S. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1912.)

No. 2,049.

1. RAILROADS (§ 229*)—SAFE APPLIANCES—DRAWBARS—LOCATION—"FREIGHT CARS."

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), provided that within 90 days after the passage of the act the American Railway Association was authorized to designate to the Interstate Commerce Commission the standard height of drawbars for freight cars, for each of the several gauges of railways in use in the United States, and should fix a maximum variation from such standard height to be allowed between the drawbars of empty and loaded cars. The section then requires all common carriers engaged in interstate commerce to conform their cars thereto, and imposed a penalty for the use in interstate commerce after July 1, 1895, of cars not conforming to the standard. Held, that the term "freight cars," as used in such section, included the locomotive at the head of the train and the caboose at the other end, so that the use of a locomotive with a drawbar on the front end not conforming to the specified height constituted a violation of the act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*

For other definitions, see Words and Phrases, vol. 4, p. 2976.]

2. RAILROADS (§ 229*)—EQUIPMENT—DEFECTIVE DRAWBAR.

Where a locomotive engaged in interstate commerce was equipped with a drawbar on the front end of improper height, in violation of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1314), the use of such locomotive in interstate commerce while so equipped constituted a violation of the act, though, after an unsuccessful attempt to use the front drawbar for the transfer of cars, the locomotive was sent to the roundhouse and reversed, and thereafter only the tank end was used to couple the locomotive to cars.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

In Error to the District Court of the United States for the District of Montana.

Action by the United States against the Chicago, Milwaukee & Puget Sound Railway Company. Judgment for plaintiff.

M. S. Gunn, of Helena, Mont., and H. H. Field, of Seattle, Wash., for plaintiff in error.

James W. Freeman, U. S. Atty., and C. M. List and Philip J. Doherty, Sp. Asst. U. S. Attys.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before GILBERT and ROSS, Circuit Judges, and WOLVER-TON, District Judge.

GILBERT, Circuit Judge. The United States brought an action to recover a penalty of $100 for an alleged violation of Act Cong. March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), known as the "Safety Appliance Act." The violation alleged was the failure on the part of the plaintiff in error to comply with section 5 of the act, in that the height of the drawbar on the front end of a certain engine, measured perpendicularly from the tops of the rails to the center of the drawbar, was 30 inches, whereas the standard height for drawbars for freight cars on standard gauge roads as prescribed by the Interstate Commerce Commission was 34½ inches measured from the tops of the rails to the center of the drawbars, with a permissible maximum variation between loaded and empty cars of 3 inches. The government inspectors testified that on January 10, 1910, the coupler on the front end of the engine was being used in switching cars in the yard, and, while it was attached to a string of cars, the cars broke loose from the engine on account of the defective condition of the pilot beam that holds the coupler, with the result that the drawbar was lowered; that thereafter the engine was taken to the roundhouse, turned around, and was taken down to the west end of the East Butte yard, and used to make up a transfer train for Butte, the rear end of the tender being used for this purpose.

[1] The plaintiff in error moved for a directed verdict in its favor, but the court below directed a verdict against it. The plaintiff in error contends that this was error, for the reason that locomotives are not included in the designation "freight cars" as used in section 5 of the act. It is admitted that in Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, in construing section 2 of the act, which prohibits the use of cars in interstate traffic unless equipped with automatic couplers, it was held that locomotives are included in the term "cars," but it is argued that "cars" is a general term, and may well include all kinds of rolling stock, whereas "freight cars" is a specific designation of certain kinds of cars, and its meaning is not to be extended beyond the precise terms used. In the Johnson Case the court said:

"Tested by context, subject-matter and object 'any car' meant all kinds of cars running on the rails, including locomotives, and this fact is supported by the dictionary definitions and by many judicial decisions, some of them having been rendered in construction of this act."

We think, in view of the language of the act and its purpose, it was intended to include within the term "freight cars" all cars used in the movement of freight, whether freight was actually stored in them or they were used for the purpose of moving the train, and that there is included therein the locomotive at the head of the train and the caboose at the other end. The evils to be remedied and the dangers to be averted were just as great and demanded legislation as much in the case of a locomotive as in the case of any car in the

train. But all doubt is removed by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1314), which amended the prior act, and enacted that its provisions and requirements relating to automatic couplers and heights of drawbars, etc., "shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce." In Southern Railway v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. ——, the court said that the effect of this amendment was to enlarge the scope of the prior act. Said the court:

"For these reasons it must be held that the original act, as enlarged by the amendatory one, is intended to embrace all locomotives, cars and similar vehicles used on any railroad which is a highway of interstate commerce."

[2] But it is contended that a verdict should have been directed for the plaintiff in error upon the proof that, after the unsuccessful attempt to use the front end of the locomotive for the transfer of cars, the locomotive was sent to the roundhouse and reversed, and thereafter the other end only was used. We do not see how that fact mended the situation in any degree whatever. The defective drawbar still remained on the front end of the engine, and the defective engine remained in use. It may be true that no reasonably prudent railroad employé would have attempted to couple to the front end of the locomotive with knowledge of its condition, but that fact does not avoid the violation of the statute. The defective drawbar remained a danger and a menace, and, when all is said, the fact remains that its use in that condition was prohibited. United States v. Denver R. G. R. Co., 163 Fed. 519, 90 C. C. A. 329; United States v. Central of Georgia Ry. Co. (D. C.) 157 Fed. 893; United States v. Philadelphia & R. Ry. Co. (D. C.) 160 Fed. 696; United States v. Atchison, T. & S. F. Ry. Co. (D. C.) 167 Fed. 699; United States v. Baltimore & O. R. Co. (D. C.) 170 Fed. 456. We are referred to Wabash R. Co. v. United States, 172 Fed. 864, 97 C. C. A. 284, as authority for the proposition that a locomotive engine used in interstate commerce need not necessarily have an automatic coupler at both ends. The court in that case held there was no violation of the Safety Appliance Act in the use of an engine which had originally been equipped with automatic couplers at the A end and the B end, but thereafter the lock chain had been disconnected and the knuckle removed from the coupler at the B end, leaving that coupler in such a condition that no other car could be coupled thereto or uncoupled therefrom, and where it appeared that the coupler at the A end was the only one used at the time in question in moving interstate traffic. While with all respect for that court we are inclined to doubt the correctness of that ruling, we find it sufficient for the present case to point to the difference between that case and this. There the coupler had been disconnected and the knuckle taken out "in pursuance of a purpose that it should not be used." In the case at bar the plaintiff in error was found using a defective coupler at one end of the engine, and thereafter, having reversed the engine, was found using the other end for the purpose of transferring cars. Nothing was shown indicative of a purpose to refrain from using both ends of the locomotive for

coupling, and no portion of the defective coupling device was removed. That device remained, as it was before, a trap to the unwary. The law may not require that a locomotive shall be equipped with couplers at both ends, but it does require that, if a locomotive is so equipped, the couplers shall be such as to comply with the Safety Appliance Act.

The judgment is affirmed.