UNITED STATES v. CHICAGO, ST. P., M. & O. RY. CO.

No. 8843.

Circuit Court of Appeals, Eighth Circuit.

Aug. 18, 1930.

Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and Monroe C. List, Sp. Asst. to U. S. Atty., of Washington, D. C.

R. N. Van Doren and Nelson J. Wilcox, both of Chicago, Ill., and William T. Faricy, of St. Paul, Minn., for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

This action was brought to recover a penalty prescribed by the Safety Appliance Acts as extended by the Interstate Commerce Commission's order of June 6, 1910. Judgment was in favor of the defendant, and the government has appealed. The facts were stipulated and are substantially as follows: On October 18, 1928, the railway company, an interstate carrier, was operating over its line in St. Paul, Minn., in an easterly direction for a distance of two miles, a certain passenger train consisting of a locomotive engine and tender, eleven passenger cars, and a pusher locomotive engine with its tender attached. All of the cars, locomotives, and

tenders were equipped with power brakes, more than 85 per cent. of which were operated by the engineer of the head engine. A sufficient number of the cars in the train were so equipped with power brakes that the engineer of the locomotive drawing the train could and did control its speed without requiring brakemen to use the common hand brake for that purpose. The pusher engine and its attached tender were coupled to the rear end of the train and did not have their power brakes used and operated by the engineer of the head engine. Had they been so coupled up, they could have been controlled by the engineer of the head engine, and in case of emergency the engineer of the pusher engine could have applied the emergency brake and stopped the train. The grade from St. Paul upon which the train was proceeding ranged from 1.25 to 2 per cent. At the end of the two miles, the pusher engine and its attached tender was uncoupled while the train was in motion by a switchman operating the uncoupling lever. This method of operating had been used by the defendant for more than fifteen years and by the United States Railroad Administration when the railroad was being operated by the government. The same practice has been followed by other railroads in various parts of the country. During the past fifteen years no accidents have resulted on any railroad in or about St. Paul from the practice in question. The speed of the train in question was not in excess of twenty miles per hour. At other points on its railroad the defendant carries out the same practice, under similar circumstances, to wit, at Knapp, Wis. and at Hudson, Wis. In order to have had the power brakes of the pusher engine used and operated by the head engineer, it would have been necessary for the air hose between the last car and the pusher engine to be connected and the angle cock on each hose to be opened by hand by men going between the cars for that purpose, which would be done while the train was standing at the Union Depot at St. Paul. In order to uncouple the pusher engine and attached tender from the rest of the train while in motion, it would have been necessary first for the angle cocks to be closed and the air hose to be disconnected by hand, which would require a man to go between the last car and the pusher engine while in motion, while the operation of the pusher engine and attached tender, as actually done in the instant case, did not require the presence of a man between the rear car and the pusher engine, as the pusher engine was uncoupled from the rear of the train

by a switchman standing on the footboard and operating the uncoupling lever from the side of the engine. The presence of a man between the pusher engine and the last car, in order to close the angle cocks and disconnect the air hose while the train was in motion, would have resulted in some risk to the employee. The alternative to such a practice, had the power brakes on the pusher engine been connected up with the rest of the train, would have been the stopping of the train for the purpose of closing the angle cocks and disconnecting the air hose while the train was standing. Such stopping, where the pusher engine was actually uncoupled in the instant operation, would have left the train standing on an ascending grade too steep for the head engine with the eleven cars to negotiate from stop position without the assistance of the pusher engine, and, therefore, in order to reach a stopping place where the train could have started again without the aid of the pusher engine, it would have been necessary for the train to have proceeded an additional distance of four miles with the aid of its pusher engine. After a stop, and for the purpose of turning the angle cocks and disconnecting the air hose, additional time would be consumed for the train again to get up speed, all of which would consume several minutes, whereas the method of uncoupling the pusher engine from the rear car in the instant case was done without slowing up the train.

The pertinent provisions of the acts of Congress and order of the Interstate Commerce Commission are as follows:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." Section 1, c. 196, Act March 2, 1893 (45 USCA § 1).

Also:

"Whenever * * * any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said 50 per centum shall have their brakes so used

and operated." Section 2, c. 976, Act March 2, 1903 (45 USCA § 9).

Pursuant to authority conferred upon it by a provision of this last quoted section of the act of 1903, the Interstate Commerce Commission on June 6, 1910, promulgated an order reading as follows:

"That on and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 per cent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-brake cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated."

The lower court held that the pusher engine with its attached tender was not a car within the meaning of the above quoted statutes and order, and that the pusher engine with its attached tender was not an associated unit of equipment with the cars and engine to which it was attached. This appeal, therefore, presents two questions: (1) Was the pusher engine and its tender, a car within the air brake provisions of the Safety Appliance Act, and (2) was the pusher engine and its tender, associated together with the 85 per cent. of the cars of the train which had their brakes used and operated by the engineer of the locomotive drawing the train? If either one of these questions be decided in the negative, then the judgment of the lower court must be sustained; but if both of these questions are decided in the affirmative, then the judgment of the lower court must be reversed. These acts of Congress and orders of the Commission should be liberally construed for the purpose of relieving trainmen of the danger in the use of hand brakes, and to control the safety of trains and of persons and property being transported in interstate commerce. New York Central R. R. Co. v. United States, 265 U. S. 41, 44 S. Ct. 436, 68 L. Ed. 892; Johnson v. Southern Pacific Co., 196 U. S. 1, 25 S. Ct. 158, 49 L. Ed. 363. The national courts have uniformly held that the provisions of these Safety Appliance Acts are mandatory and impose an absolute duty upon the carrier. St. L., I. M. & S. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; C., B. & Q. Ry. Co. v. United States, 220 U. S. 559, 31 S. Ct. 612, 55 L. Ed. 582; United States v. A., T. & S. F. Ry. Co. (C. C. A.) 163 F. 517. If, therefore, the statute is applicable to the equipment and train movement involved in this action, any

question of utility or convenience must be put aside.

It is the contention of the government that under the doctrine announced by the Supreme Court in Johnson v. Southern Pacific Co., supra, the pusher engine and its attached tender constituted a car within the provisions of the above quoted acts and order. In that case the appliance involved was an automatic coupler, and the court held that locomotives were required to be equipped with such couplers, even though the act did not use the word "locomotive," but used the words "any car." From this it is argued that a locomotive and a car are the same for all purposes of the Safety Appliance Acts. It is to be observed that the Safety Appliance Act in question makes separate provisions for brakes in regard to locomotives and in regard to cars. As to locomotives it provides that:

"It shall be unlawful for any common carrier * * * to use on its line any locomotive engine * * * not equipped with a power driving-wheel brake and appliances for operating the train-brake system."

As to cars, it provides that it shall be unlawful "to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common handbrake for that purpose."

The order of the Commission requires that whenever, by the Safety Appliance Act as amended, "any train is operated with power or train brakes, not less than 85 per cent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power brake cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated."

Both the act and the Commission's order mention a locomotive separately from cars. We therefore have a statute and order mentioning locomotives and also mentioning cars, and prescribing different equipment for the one from that prescribed for the other. In the instant case, the pusher engine was equipped, as required by the act, with power driving wheel brake and apparatus for attachment, and all of the cars of the train were equipped with proper power brakes used and operated by the engineer of the drawing engine, and under no circumstances was it necessary that the brakemen use the common hand brake for the purpose of controlling

the speed of the train. The Johnson Case considered the act requiring automatic couplers. This act, in so far as it referred to couplers, did not name locomotives separately from cars, and unless automatic couplers were required on locomotives by reason of their inclusion in the words "any car," they were not required at all. As to brakes, however, it has already been observed the act specifically prescribes "power driving wheel brakes for locomotives." As to automatic couplers, there was just as great necessity for having them on locomotives as on cars, but as locomotives are equipped with their own air brakes, and with men on the engine to operate them, there would seem to be reason for treating them as separate and independent from "power brake cars." With a locomotive so equipped, both its own speed, and that of the train composed of power brake cars, could be controlled "without requiring brakemen to use the common handbrake for that purpose." In the instant case, the engineer of the drawing locomotive had control of the train without the assistance of hand brakes and without the pusher engine and its tender being air coupled to the rest of the train. While the Supreme Court in the Johnson Case held that a locomotive engine was a car within the meaning of the automatic coupler provision of the Safety Appliance Act, and in Southern Ry. Co. v. Crockett, 234 U. S. 725, 34 S. Ct. 897, 58 L. Ed. 1564, held that a locomotive was a car within the draw bar provisions of the act, it is to be observed that these provisions, one requiring the installation and use of automatic couplers, and the other fixing and requiring the use of draw bars of standard height, were, from a practical standpoint, as necessary on locomotives as on cars, and the Safety Appliance Act did not speak separately of locomotives in prescribing couplers nor the height of drawbars, as it does in regulating the subject of train brakes. As said by Mr. Justice Holmes in Towne v. Eisner, 245 U. S. 418, 38 S. Ct. 158, 159, 62 L. Ed. 372, L. R. A. 1918D, 254:

"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

So, in Davis v. Manry, 266 U. S. 401, 45 S. Ct. 163, 164, 69 L. Ed. 350, the court held that the act requiring that all cars should be equipped with ladders and running boards, and all cars having ladders should also be equipped with handholds or grabirons on their roofs at the top of the ladders, did not

require the railway company to equip a tender with grabirons on its top or roof, and in Pennell v. Philadelphia & Reading Railway Company, 231 U. S. 675, 34 S. Ct. 220, 221, 58 L. Ed. 430, that the act did not require the railway company to maintain and install automatic couplers between the engine and the tender. The Circuit Court of Appeals of the Second Circuit, in Lehigh Valley R. Co. v. Beltz, 10 F.(2d) 74, 76, after citing several Supreme Court decisions, says:

"But clearly a 'locomotive' and a 'car' are not the same for all the purposes of the Safety Appliance Acts."

Locomotives and tenders are included within the term "cars" in those cases where the statute or order of the Commission is such as applied to the appliance and the equipment that no sufficient practical distinction can be made between cars and locomotives. In other words, where the same reasons for requiring the installation and maintenance of the appliance on an engine or a tender exists as for requiring it on a car, and there is no separate provision with reference to the equipment required on the locomotive, then the locomotive has been construed to be a car. In Pennell v. Philadelphia & Reading Ry. Co., supra, plaintiff sought to recover damages for an accident alleged to have occurred because of the absence of an automatic coupler between the engine and its tender. In that case plaintiff urged that the tender should be treated as a car and relied upon the Johnson Case in support of his contention. Referring to this contention the court said:

"We are brought to the question, Is the tender of a locomotive a car within the meaning of the statute?

"Plaintiff asserts the affirmative of the question and cites Johnson v. Southern P. Co., 196 U. S. 1, 25 S. Ct. 158, 49 L. Ed. 363, and a number of state decisions. The case does not so decide. It does decide that the locomotive is a car within the meaning of the act. No distinction was made between it and the tender; the latter was deemed integral with the locomotive. In other words, tender and engine were considered as constituting the locomotive. Necessarily a locomotive thus constituted was decided to be a 'car' within the meaning of the act, and necessarily had to be coupled with the cars, which constituted the train. And in this necessity the dangers to employees would occur which the act was intended to prevent. Any other construction would have left the act denuded

of some of its value. In other words, there would have been only a partial enforcement of its protection in instances where protection was oftenest needed. To omit the locomotive, composed of engine and tender—and it was considered as so composed in the cited case—was to omit part of a train which was within all the mischiefs of the act, and therefore covered by its remedies. No such conditions exist in the present case. Engine and tender are a single thing; separable, it may be, but never separated in their ordinary and essential use. * * * The case at bar, therefore, is not brought either within the mischief or the remedy of the act."

See also Wabash R. Co. v. United States (C. C. A.) 172 F. 864; United States v. C., St. P. M. & O. Ry. Co. (D. C.) 34 F.(2d) 812; United States v. C., St. P., M. & O. Ry. Co. (C. C. A. 7) 41 F.(2d) 927.

It is to be noted that although the Safety Appliance Act (45 USCA § 11) requires "handbrakes" on all "cars," and this provision applies specifically to "every vehicle" subject to the act as amended March 2, 1903 (45 USCA § 16), the Interstate Commerce Commission has never claimed that this provision requires "hand brakes" on "locomotives." By its order of March 13, 1911, it is specifically provided that "hand brakes will not be required on locomotives, nor on tenders when attached to locomotives." In an opinion by District Judge Luse in United States v. C., St. P. M. & O. Ry. Co., recently affirmed on appeal to the Circuit Court of Appeals of the Seventh Circuit, a situation identical with that presented in the instant case was under consideration. District Judge Luse, after referring to the decision of the Supreme Court in the Johnson Case said:

"Hence it follows that a locomotive is not to be excluded from the operation of the order in question merely because the order uses the term 'cars,' if the order otherwise makes no sufficient distinction between cars and locomotives.

"The first requirement of the order is that 'not less than 85% of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train.' In such language a clear distinction is made between the locomotive drawing the train and the cars composing the train. The locomotive is treated as the source of power, not only for drawing the train but for the application of braking power to the 'cars of such train.' The idea conveyed is the ordinary one of a train of cars drawn by a locomotive, with a distinction drawn between the two classes of vehicles. The next phrase is:

'And all power brake cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated.' So the real question involved here is whether the pusher locomotive here involved is a 'power brake car' within the meaning of the phrase last quoted. I have no doubt that if a dead locomotive were being hauled in a train, being equipped with power brakes, that it would be required to have its power brakes operated by the engineer of the head engine. Nor do I much question that if this pusher engine were placed between the regular locomotive and the next car and then assisted in drawing the train, that both engines would be required to have their power brakes connected by the air line and to the air line of the train behind. But that, I think, would be because both would be locomotives drawing the train and required to use and operate the train brakes of 85 per cent of the cars in the train. * * * But the pusher engine in question, it seems to me, must be considered as a part of the motive power of the train. It was assisting in moving the train up the grade, had its own power plant, its own power brakes, and men at their posts ready to operate them. The crew of the pusher engine were there to co-operate with the crew of the head engine, to co-ordinate with the movement of the pusher to the needs of the train, and its crew and power driving wheel brakes were ample to keep it from interfering with any control which the engineer of the head engine might care to exercise. The 'pusher' then was quite different from a power-braked car, which is inert, powerless and without means of applying its power brakes and which remains uncontrolled except its brakes be operated by the engineer of the head engine or the forbidden practice of using its hand brakes be indulged in."

In affirming this decision the Circuit Court of Appeals [41 F.(2d) 927, 928] said:

"While locomotive engines have been held to be 'cars' within the provisions of this act, Johnson v. S. Pacific Company, 196 U. S. 1, 15, 25 S. Ct. 158, 49 L. Ed. 363; St. Joseph & Grand Island v. Moore, 243 U. S. 311, 37 S. Ct. 278, 61 L. Ed. 741; C., M. & P. S. v. U. S. (C. C. A.) 196 F. 882; Southern Railroad v. Crockett, 234 U. S. 725, 34 S. Ct. 897, 58 L. Ed. 1564; Pennell v. P. & R. R. R. Co., 231 U. S. 675, 34 S. Ct. 220, 58 L. Ed. 430; they are not necessarily so, Davis v. Manry, 266 U. S. 401, 45 S. Ct. 163, 69 L. Ed. 350. This court in Wabash Railway v. U. S., 172 F. 864, 865, said: 'The difficulty with this reasoning is (that an engine being a car in some instances must always be con-

sidered a car), first, in the assumption that under the doctrine of the Johnson Case a locomotive and a car are synonymous terms in every respect and for every purpose—a rigidity of construction that the Supreme Court never intended.' The limited purpose of the pusher engine on the train, its inability to successfully carry out its purpose, if its power brakes be connected with the air controlled by the front engine, tends to support appellee's construction of the statute."

■■ The pusher engine in the instant case was a part of the motive power of the train. Neither the wording nor the intent of the air brake provisions of the Safety Appliance Act requires that an engine so used be included within the designation "cars." This view is strengthened by the fact that the method of operation here assailed does not present any evil which the power brake provisions of the Safety Appliance Act was designed to remedy. It is significant, too, that this practice has been going on openly and unchallenged for many years, and when the government was operating this railroad the same practice prevailed. As said by the Supreme Court in Pennell v. Philadelphia & Reading Ry. Co., supra:

"The custom of the railroads could not, of course, justify a violation of the statute, but that custom, having the acquiescence of the Interstate Commerce Commission, is persuasive of the meaning of the statute."

Again in Davis v. Manry, supra, that court said:

"The omission to require a grab iron is a practical construction by the commission—the tribunal to which the application of section 2 [45 USCA § 11] was entrusted and which would be solicitous to enforce it—that it applies to cars with roofs and not to tenders, they having no roofs. While the view of the Commission is not conclusive with us, it is properly persuasive."

The same rule has long prevailed in the national courts. United States v. Hill, 120 U. S. 169, 7 S. Ct. 510, 30 L. Ed. 627; United States v. Alabama G. S. Railroad Co., 142 U. S. 615, 12 S. Ct. 306, 35 L. Ed. 1134; United States v. Cerecedo Hermanos Y Compania, 209 U. S. 337, 28 S. Ct. 532, 52 L. Ed. 821; National Lead Co. v. United States, 252 U. S. 140, 40 S. Ct. 237, 64 L. Ed. 496; Wisconsin v. Illinois, 278 U. S. 367, 49 S. Ct. 163, 73 L. Ed. 426.

■ If the meaning of this statute were in doubt, the practical construction given it through all these years should be presumed to be the correct one, and this is particularly

true where there has been a contemporaneous construction of the statute by those charged with its execution and application. We should be reluctant to overturn a long standing departmental construction, presumably known to the legislative department which has made no amendments to the act, seeking to make it applicable to the practice now challenged in this action.

We are of the view that the practice challenged in this case did not constitute a violation of the power brake provisions of the Safety Appliance Act, nor of the order of the Interstate Commerce Commission based thereon. As this disposes of the case, it seems quite unnecessary to consider the question as to whether or not the pusher engine and its attached tender, both equipped with power and train brakes, on the rear of this train, was "associated together with the 85 per cent of the cars of the train which had their brakes used and operated by the engineer of the locomotive drawing the train."

The judgment of the lower court should be, and is, affirmed.