## UNITED STATES v. PENNSYLVANIA R. CO.

### Civil Action No. 3862.

United States District Court
D. Maryland.
Aug. 7, 1948.

966

C. R. McKenrick, of Baltimore, Md., and James O. Tolbert, of Washington, D. C., for the Government.

O. Bowie Duckett, Jr., of Baltimore, Md., and Adelberg S. Schroeder, of Philadelphia, Pa., for defendant.

COLEMAN, Chief Judge.

This is a complaint brought by the Government under Section 9 of the Safety Appliance Act, 45 U.S.C.A. §§ 1–16, which provides, in relation to the number of cars to be operated with power or train brakes, as follows: "Whenever, as provided in this chapter, any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said 50 per centum shall have their brakes so used and operated; and, to more fully carry into effect the objects of said chapter, the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid; and failure to comply with any such requirement of the said Interstate Commerce Commission shall be subject to the like penalty as failure to comply with any requirement of this section." In 1910, pursuant to this section, the Interstate Commerce Commission ordered the minimum percentage of cars in a given train required to be equipped with brakes operated from the train's locomotive, increased from 50 per cent. to 85 per cent., as set forth in this section.

The material facts have been stipulated by agreement of the parties and are as follows:

The alleged violation occurred on January 8, 1948. Prior to the movement of the cars here involved, their crew had been engaged in various other switching movements. This entire movement was confined to a small section of the Baltimore Terminal Yard Switching Limits in the industrial southeast section of Baltimore City. It was made entirely over yard and secondary tracks on which the maximum speed allowed is 15 miles per hour. This is known as restricted speed under the railroad rules, but the draft or group of cars must be prepared to stop short of any obstruction, train, improperly lined switch, broken rail, etc. No part of the movement was over or across main track. It was conducted by a yard crew. No passenger trains use these tracks. The movement is not made under train-time schedules. There is no block signal system controlling these tracks, and the drafts do not constitute a "train" under the railroad rules or practices.

The so-called draft of cars in question was assembled on track no. 28, south bound classification yard at Bay View, and was despatched at 2:05 p. m. over yard tracks to Highlandtown Yard, where a stop was made and thence to Canton by a secondary track, arriving there at 2:35 p. m., the total distance being 1.9 miles. Twenty-seven of the cars contained coal for export; three were loaded with sodium ammonia; one with pipe for export, and one local car with shavings, which was switched out at Canton for St. Helena. The cars for export were likewise switched.

This slow moving draft crossed two street grade crossings, protected twenty-four hours by manually operated safety gates, and two intersecting yard tracks of the Canton and B. & O. Railroad, which are adequately supervised and protected. This operation has been free of accidents.

There is only one material fact which was not agreed upon, and on which substantial testimony was taken, namely, the location of the caboose. This the most important factual question, since the caboose was the only car in the entire train which was found to be defective under the requirements of Section 9 of the Act.

On this point, after hearing the directly conflicting testimony, the Court is left in a state of doubt. It seems rather extraordinary that there should be this conflict on the part of two sets of experienced men who were present at the time the train was made up and moved. As has been said by counsel for the railroad, there would appear to be, in the absence of some other important factor which does not seem to exist, a prima facie presumption that the testimony given by members of the train crew is to be accepted as true. They testified emphatically that the caboose was at the dead-end of the train, that is, with the engine and tender between it and the line of freight cars, whereas the inspectors—who appeared to the Court to be equally positive and equally trying to tell the truth—said just the contrary, namely, that the caboose was between the engine and the line of freight cars.

So, initially, we have two questions: (1) Was the caboose "associated" with the other cars, within the meaning of the Act; and (2) was this a train movement or a switch movement?

It is conceded by counsel for the Government that if the Court finds, as a matter of fact, from the evidence, that the caboose was not, as the railroad witnesses say, on the dead-end of the line of cars, but was between the engine and the freight cars, as the Government witnesses say, then the question is presented as to what is meant by the phrase "associated together," as used in Section 9 of the Act, and also the question as to whether this particular movement was a train or a switch movement. It is clear, however, that if the Court should conclude that the railroad witnesses are correct as to the location of the caboose, namely, that it was not between the engine and the freight cars, there is ample and convincing authority for holding that this would not constitute the "association" between the caboose and the other cars as contemplated by Section 9; and, since the caboose was the only car which had defective brakes, the major question, namely, whether the operation was a train movement or a switch movement, would not, therefore, be before the Court for decision.

Since, however, the Court is unable to make up its mind from the state of the testimony, as to just what was the actual location of the caboose; and since it is important, the Court will proceed to decide the question as to the character of the movement on the assumption that the testimony of the Government witnesses is correct, to the effect that the caboose was between the engine and the line of cars. If it were otherwise, as has just been said, the law seems so clear as not to require the citation of authorities that the caboose is not to be treated as having been "associated" with the rest of the cars.

While the Court has been referred to no case involving the precise situation we are assuming to have existed, nevertheless, in New York Central Railroad Company v. United States, 265 U.S. 41, 44 S.Ct. 436, 68 L.Ed. 892, it was held that if the defective car were placed in the rear of all of the cars having their brakes operated by the engineer, there would be no violation of the Act. The same question has been decided several times in the case of a pusher engine and tender. See especially United States v. Chicago, St. P. M. & O. R. Co., 7 Cir., 41 F.2d 927; United States v. Chicago, St. P. M. & O. R. Co., 8 Cir., 43 F.2d 300, 71 A.L.R. 507.

The Safety Appliance Act, with amendments, has been in effect since 1893, so it is natural that there have been many decisions involving it. From this wealth of decisions, both by the Supreme Court and the lower courts, the following rule seems to be firmly established, which must govern this Court in the present case, namely, that the test of whether the movement of an engine and cars is a train movement, so as to subject the railroad to penalty for not having air brake connections with the engine, as is required under section 9 of the Act, or is a mere switch movement, lies in the essential nature of the

operation; the number of cars; the kind of track; and whether the operation was by switch engine and switch crew, or by a regular engine and crew.

There has been a great deal of testimony in this case as to the hardship, not only from the point of view of cost but of delay in operation, that would ensue were the Government's position to be adopted. While that is an element to be taken into account, it cannot be controlling if, as a matter of fact, we have a situation which flies in the face of section 9 of the Act.

The Court does not think the Government has cited any case in which the courts have gone as far as the Government would have us go in the present instance. The nearest case on its facts to the present one is probably United States v. Southern Pacific Company, 60 F.2d 864, a decision of the Ninth Circuit in 1932. There, summarizing the facts very briefly, there were car movements by a switch engine between separate sections of the terminal yard, connected by a mile long track across eight city streets. The case involved a number of separate operations in which groups of cars, varying in number from 8 to 26, were pushed or pulled by switch engines along a track about a mile long. This track served a number of industrial sidings but did not form a part of the railroad's main line; and it crossed eight city streets at grade, where watchmen were kept at certain intersections, but only during the day time, and no separation of the cars was made between the two yard sections, nor was it intended that there should be. The court held that all of these movements constitute train, as opposed to switching, movements. It is obvious that there are factual conditions distinguishing that case from the one now before us. The court must have been greatly influenced by the fact that there were no air brakes coupled for use in any of those movements, whereas in the present case none of the freight cars was defective, but merely the caboose. Then, also, it appears that the movements were through a crowded section, very much more so than was the movement in the present case, although grade crossings had to be crossed within the switching area involved in the present case.

In a later case, United States v. Great Northern Railway Company, 9 Cir., 73 F. 2d 736, the same court had a related case but distinguished its earlier decision just referred to, and held that it was correct to submit to the jury the question whether the movement was a train movement or a switch movement, and, in the course of its opinion, had this to say about the earlier case, 73 F.2d 736, at page 740: "There are important distinctions in this case from those relied upon by the appellant to support the contention that this isolated movement presented here was a train movement. In the case of United States v. Southern Pacific Co., (C.C.A.) 60 F.2d 864, 865, cited by appellant, this court extended liability to the limit, but in that case the inquiry was whether under the conditions described separate yard sections or units, which were a mile apart, connected by a track upon no point of which, between the two yard sections, any separation of cars occurred, and where there was no purpose that any should occur, constituted a single terminal yard. The court held that 'a distant set of switching facilities, whether reached over a main line track, or over a distant track limited in its use to transfer purposes, will be classed as a separate yard.'"

We are satisfied that this latter case which the Government has cited as perhaps the one nearest to the facts in the present case, is distinguishable for the reasons given.

This Court has been referred to no case in the Fourth Circuit which goes as far as the Government would have us go. Chesapeake & Ohio R. Co. v. United States, 4 Cir., 226 F. 683, is clearly distinguishable. There the defendant railroad moved a train of 55 cars from Fulton yard in Richmond, over the main line of its railway, to the Albemarle Paper plant, a distance of about two miles. In making this movement the automatic brakes were coupled up and in use on the first 12 cars of the train, but not on the other 43 cars. This operation was what is known as a "transfer"; that is, it was a movement of a considerable number of cars coupled together from the Fulton yard, where trains were broken up, to the Second Street yard, where they were

sorted out for delivery to other yards and sidings in the city. The cars so associated for this purpose are called a "drag," as no caboose is attached and the cars are hauled by a transfer engine.

The court in its opinion said, 226 F. at page 687: "At the time this movement took place the Safety Appliance Law, as modified by an authorized order of the Interstate Commerce Commission, required that any train operated with power or train brakes should have such brakes used and operated on not less than 85 per cent. of the cars composing such train, which concededly was not done in this instance. The defendant, however, contended that this requirement did not apply to the hauling of a train or 'drag' of cars in transfer service, and therefore the facts shown did not charge it with liability. The trial court overruled this contention, and the jury under instructions found a verdict for the government. The correctness of this ruling has lately, and since this case was argued, been fully upheld by two decisions of the Supreme Court. United States v. Erie R. Co., 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019, and United States v. Chicago B. & Q. R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023, rendered in May, 1915. The case at bar is clearly covered by these decisions, and the question involved is no longer open to discussion."

If we refer to those two cases upon which the court relied, we find that they are based upon facts which can clearly be differentiated from the present case. In the first of them, railroad yards belonging to the same railroad, but several miles apart, although important accessories of the same terminal, were held to be not actually one yard, and that trains moving between them were not engaged merely in switching operations but in transportation within the provisions of the air brake provision of the Act. The court in that case said, 237 U.S. at page 408, 35 S.Ct. at page 624: "They [the trains] were made up in yards like other trains, and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local. They were not moving cars about in a yard or on tracks set apart for

switching operations, but were engaged in main-line transportation, and this in circumstances where they had to pass through a dark tunnel, over switches leading to other tracks, and across passenger tracks whereon trains were frequently moving. Thus it is plain that in common with other trains using the same main-line tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements."

In the second case, United States v. Chicago B. & Q. R. Co., it was held that railroad yards belonging to the same railroad, but several miles apart, were likewise not actually one yard, and that trains moving upon them were not engaged merely in switching operations but in transportation within the provisions of the Safety Appliance Act.

The court in that case, 237 U.S. at page 411, 35 S.Ct. at page 635, said: "Both yards are used for receiving and breaking up incoming trains, assembling and starting outgoing trains, and assorting, storing, and distributing cars. To reach their ultimate destinations, whether on defendant's road or on those of other carriers, a large proportion of the cars have to be moved from one yard to the other, and this is accomplished by transfer trains which are run over the main-line track connecting the yards. These trains usually consist of an engine and about thirty-five cars, are operated by what are termed yard or switching crews, and carry no caboose or markers. They have no fixed schedules and are not controlled by a train despatcher, but by block signals, as are all other trains moving over the same track. Each train is moved as a unit from one yard to the other, and not infrequently is both preceded and followed by other trains, passenger and freight."

We have dwelt at some length on those Supreme Court cases because the decision of this Circuit on which the Government relies, that is, Chesapeake & Ohio R. Co. v. United States, supra, takes those Supreme Court decisions, as it must if they are controlling, for its authority. We believe an analysis of those decisions, such as just

made, shows that they do not on their facts control the present case.

Thus, we reach the conclusion that the Government's contention in the present case cannot be sustained even if we assume, although we are no entirely convinced, that the testimony of its witnesses is true. In so deciding, we are not attempting to lay down a rule to the effect that the absence of any use of a main line is controlling in and of itself, or that the particular type of crew, equipment, or any other one factor, should per se control. But, taking all of the established facts together in this case, and even assuming that the only controversial fact is also resolved in the Government's favor, we fail to find that there is any support in the authorities to date for going as far as the Government would have us go, and that to do so would be an unwarranted extension of the Safety Appliance Act, as we read its provisions.

We do not want to be in the least understood as taking a position which will enable the railroads to treat lightly this very vital requirement of the law. Nor—as has already been said—are we influenced by the argument of cost that would be involved, if the Government's position were maintained; but we are controlled in our interpretation of the law by what we believe is the more reasonable position to take on the factual situation as here actually presented—not merely with respect to the particular railroad concerned, but with respect to the safety of both railroad employees and the public at large. There appears to be no safety hazard involved that would be lessened by taking the Government's position.

The law must be construed reasonably, sensibly, with due regard for each factual situation. If this Court thought that the intent of the Supreme Court's decisions was to go as far as the Government would have us go, this Court would be bound to go that far. Similarly, with respect to any such decision by the Circuit Court of Appeals of this Circuit; and, indeed, any such decision by the appellate court of any other Circuit would be persuasive authority, although not necessarily controlling. But we do not believe, considering the public interest, as well as the rights of the

railroad, an interpretation as stringent as the Government seeks is required on these precise facts.

An order will be signed in accordance with this opinion.